<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                  :
ROMAN CHARIOT, LLC,               : CIVIL ACTION NO. 06-626 (MLC)
                                  :
        Plaintiff,                :      MEMORANDUM OPINION
                                  :
        v.                        :
                                  :
JMRL SALES & SERVICE, INC., et al.,:
                                  :
        Defendants.               :
                                  :
```

**COOPER, District Judge**

Plaintiff, Roman Chariot, LLC ("RC"), moves, pursuant to
Federal Rule of Civil Procedure ("Rule") 65, for a preliminary
injunction to enjoin the defendants from, <u>inter</u> <u>alia</u>: (1)
disclosing RC's trade secrets and confidential information
relating to the ownership and sale of specialty sightseeing
buses, (2) selling and delivering sightseeing buses without
authorization from RC, and (3) accepting and fulfilling orders
for sightseeing buses without consent from RC.  (2-21-06 Order to
Show Cause, dkt. entry no. 3.)

RC brought this action on February 3, 2006.  (Dkt. entry no.
1).  RC generally alleges that it developed the idea and
specifications for a specialty sightseeing bus, and entered into
an agreement with defendant JMRL Sales & Service Inc. ("JMRL")
whereby JMRL would manufacture the buses.  (Compl., at 3.)[1]  RC

---

[1] JMRL does business as Craftsmen Limousine and Specialty
Bus Manufacturers, LLC.  The Court will refer to this entity as
JMRL for the purposes of this opinion.

and JMRL executed (1) a "Confidentiality and Exclusive Rights Agreement" in October 2004, and (2) an agreement in January 2005 that governed JMRL's manufacture of a sightseeing bus for Private One of New York ("Private One"), a customer of RC.  (Id. at 3-4.) RC alleges that JMRL has manufactured and sold buses embodying RC's ideas and specifications without authorization from RC, in breach of the agreements. (Id. at 6.)  The complaint specifically asserts causes of actions for (1) misappropriation and conversion, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4) tortious interference with prospective economic advantage, and (5) unfair competition.  (Id.)

The Court has considered the papers submitted by the parties, and heard oral argument on May 24, 2006.  The basic historical facts are not disputed, therefore, the Court did not conduct an evidentiary hearing.  The Court now issues its findings of fact and conclusions of law as required by Rule 52. The Court, for the reasons stated herein, will deny RC's motion.

## CONCLUSIONS OF FACT

This matter concerns a dispute between RC and JMRL over the development and manufacture of speciality tour buses.  (Compl.)[2]

---

[2] RC uses the name "Roman Chariot CTB" to refer to a tour bus comprised of a single elevated deck with an open top.  As discussed, infra, the dispute in this action also surrounds the development and manufacture of a bus with a single elevated deck and a transparent top.  For the purposes of this opinion, both types of buses will be referred to collectively as "RC CTBs." The Court, where necessary, will distinguish between those buses with an open top and those buses with a transparent top.

The majority of the certifications, briefs, and documents submitted in support of, and opposition to the motion are subject to a protective order, and have been filed under seal.  (See 4-05-06 Protective Order, dkt. entry no. 21; 6-06-06 Order.)  The Court declines to seal this opinion; therefore, the conclusions of fact articulated here will be limited to the non-confidential information that is necessary for the resolution of this motion.

The findings and conclusions set forth in this opinion are preliminary only, based upon the state of the record at this stage in the litigation.  See Fed.R.Civ.P. 65(a).  The parties have preserved all rights to present their disputes to a fact-finder for eventual adjudication on the merits.  See Clark v. K-Mart Corp., 979 F.2d 965, 969 (3d Cir. 1992) (noting that because of the limited nature of preliminary injunction proceedings, any facts and conclusions of law made are of no binding effect).

RC describes itself as a limited liability company that designs and develops specialty tour buses with either a single or double deck.  (Compl., at 3.)  The tops of the buses may be open, or enclosed with a "see through top."  (Id.)  Ronald Romano ("Romano") formed RC, and is its sole member.  (Romano Supp. Certif., at 3; 5-24-06 Tr., at 11.)

Defendants Robert J. Haswell ("Bob Haswell") and Robert M. Haswell ("Marc Haswell") founded JMRL in 1989.  (Defs. Br., at 6-7.)  JMRL is a company based in Missouri that designs and

3

manufactures custom-made limousines, limousine buses, and "single deck, open-top sightseeing buses." (Id. at 7.)

Romano alleges that in 2002, Mark Marmurstein ("Marmurstein") of Private One wanted to get involved in the New York City tour bus industry. (Romano Supp. Certif., at 2.) Romano had a business relationship with Private One, and tried to find a company that would manufacture a double-deck tour bus for Private One. (Id.) Romano alleges that during this process, he developed the idea of creating a tour bus with a single elevated deck and an open top. (RC Supp. Br., at 4.) To pursue the development of such a product Romano formed RC in 2004. (Compl., at 1.)

Bill Molitor ("Molitor"), a business associate of Romano, approached Bob Haswell at a bus trade show in September 2004. (RC Supp. Br., at 5; Defs. Br., at 8.) RC alleges that Molitor told Bob Haswell that RC had an idea for a new type of bus. Bob Haswell agreed to execute a confidentiality and exclusivity agreement in exchange for hearing about the new idea. (RC Supp. Br., at 6.)[3] RC and JMRL executed a "Confidentiality and Exclusive Rights Agreement" on October 4, 2004. (Compl., at 3; see Pavely Certif., Ex. A.) The agreement provides, inter alia,

---

[3] The defendants allege that Molitor disclosed the new bus idea before any confidentiality agreement was signed. (Defs. Br., at 12.) For the purposes of this opinion, however, the resolution of this dispute is not dispositive.

> [a]ll knowledge and information regarding the Product
> shall be considered confidential and shall not be
> disclosed or otherwise used by [JMRL] without written
> permission from RC. . .
>
> [JMRL] does not acquire any rights to the Product by this
> Agreement. . .
>
> _____ upon agreement to produce the Product for RC
> understands that RC has Exclusive Rights to the Product
> for all marketing and sales. . .

(Compl., at 3-4.)  RC disclosed to JMRL the idea of, and specifications for, creating a tour bus comprised of a single elevated deck with an open top.[4]  RC requested that JMRL manufacture a prototype that could be evaluated by Private One. (Id. at 4.)

Romano, Bob Haswell, and representatives of Private One had several meetings and discussions regarding the prototype.  (RC Supp. Br., at 7.)  Romano asserts that at a meeting with JMRL in November 2004, he disclosed the idea of adding a transparent, removable roof to the bus.  (Id.)  Romano's idea responded to Private One's request that the buses have some type of covering for use in inclement weather.  JMRL delivered a prototype of the RC CTB in December 2004.  (Id. at 8.)  Modifications and changes were made to the prototype and a second version was delivered to

---

[4] The defendants dispute that Romano provided them with "specifications," and argue that the materials Romano did provide were neither created by Romano, nor were they specifications for a single deck, open-top bus.  (Defs. Br., at 17.)  For purposes of this motion, however, the Court need not decide the exact nature of the materials disclosed, nor who "invented" the RC CTB.

Private One in February 2005.  (Id.)  But these prototypes did
not include a transparent removable roof.  (Id.)  A prototype
incorporating this idea was not completed until "mid-2005."  (Id.
at 7.)

RC and JMRL executed an agreement in January 2005 setting
forth RC and JMRL's rights and obligations in connection with the
manufacture of the bus for Private One.  (Compl., at 4.)  The
agreement covers "city sightseeing buses consisting of single or
double deck open top city tour buses and single or double deck
city tour buses with see through tops," and provides, inter alia:

> JMRL agrees not to build any "city sightseeing buses" for
> anyone else, in the State of New York, as long as Private
> One purchases all their "city sightseeing buses through
> JMRL.
>
> JMRL also agrees that Roman will be the exclusive sales
> agent for Private One purchases.
>
> It is agreed by JMRL, that Roman owns the exclusive sales
> rights for "city sightseeing buses" produced by JMRL on
> all such business produced through the franchise efforts
> of Private One. . .
>
> It is the intent of Roman to market "city sightseeing
> buses" worldwide.  With this in mind JMRL agrees to build
> such buses exclusively for Roman.
>
> JMRL agrees that Roman has exclusive rights to design and
> sales of the "city sightseeing buses" (in continuation of
> previous agreement, see attachment); and JMRL agrees to
> continue production of said buses on a per order basis .
> . .
> Roman will set up a floor-plan that enables them to pay
> JMRL for each bus they order, from JMRL when said bus is
> completed by JMRL.

Id. at 4-5; Pavely Certif., Ex. B.)  Between January 2005 and
July 2005, JMRL manufactured ten tour buses for Private One, and

6

three tour buses for an RC customer in Chicago.  (RC Supp. Br., at 10; Compl., at 5.)  JMRL sought to "redraw" the January 2005 agreement in August 2005 because it was concerned that the agreement was ambiguous and that the parties' responsibilities were not clearly defined.  (Pavely Certif., Ex. E.)  RC and JMRL disagreed over the redrawing of the agreement, but did not terminate their relationship.  RC ordered four tour buses in October 2005 with an option to order ten more.  (Romano Supp. Certif., at 9.)  The four buses were completed and delivered to Private One.  (RC Supp. Br., at 12.)

RC alleges that in December 2005, JMRL entered into an agreement to sell six RC CTBs to Suburban Transit, a competitor of Private One, without RC's authorization.  (Id. at 13.)  JMRL acknowledges that it sold six RC CTBs to Suburban Transit.  The six RC CTBs were set to be delivered in February 2006.  (Defs. Br., at 45; Pavely Certif., Ex. H.)[5]

---

[5] JMRL argues that it undertook these sales to avoid financial ruin.  (Defs. Br., at 45.)  JMRL asserts that Romano told it that Private One intended to purchase fifteen buses for delivery by Thanksgiving 2005.  (Id. at 44.)  To prepare for the order, JMRL placed binding orders for the chassis upon which the buses were built.  (Id.)  The Private One order, however, did not immediately materialize.  JMRL then told RC that it would be forced to sell buses to someone else to cover its losses.  RC ordered buses for Private One in October 2005, but the order was for four buses, not fifteen, as previously indicated.  (Id. at 45.)  JMRL, therefore, was left with eleven unused chassis.  It argues that it agreed to sell six buses to Suburban Transit to mitigate its losses.  (Id.; see also 4-14-06 Robert J. Haswell Dep., at 276.)

RC brought this action on February 3, 2006.  (Dkt. entry no. 1.)  RC sought a temporary restraining order to prevent JMRL from, inter alia, selling or offering to sell RC CTBs to anyone without RC's authorization.  (Dkt. entry no. 2.)  The Court held a hearing on the application for the temporary restraining order on February 17, 2006.  At the hearing, JMRL confirmed that (1) one bus had been delivered to Suburban Transit, (2) two more buses were scheduled to be delivered on February 21, and (3) three more buses were scheduled to be delivered after February 21.  (2-17-06 Tr., at 4.)  The Court declined to issue a temporary restraining order in part because the "bus has already left the station, at least one of them."  (Id. at 14.)  The Court did recognize, however, that the denial of a preliminary injunction could result in the delivery of more buses.  (Id.)  The Court issued an order to show cause why a preliminary injunction should not be issued.  (2-21-06 Order to Show Cause.)  The resolution of that order is now before the Court.

### CONCLUSIONS OF LAW

RC moves to enjoin the defendants from (1) disclosing RC's trade secrets and confidential information concerning the ownership and exclusive right to sell and distribute RC CTBs, (2) selling, offering to sell, and delivering RC CTBs without authorization from RC, (3) accepting and fulfilling orders for RC CTBs without authorization from RC, and (4) using RC's trade

secrets and confidential information for its own benefit or the
benefit of any other entity other than RC.  (2-21-06 Order to
Show Cause.)  The Court finds that RC has not demonstrated the
elements required to issue a preliminary injunction, therefore,
its requested relief is not warranted.

## I.   Standard to Award a Preliminary Injunction

Injunctive relief is an "extraordinary remedy, which should
be granted only in limited circumstances." Frank's GMC Truck
Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 102 (3d Cir. 1988)
(internal citation omitted).  The Court must consider whether:
(1) the party seeking a preliminary injunction has shown a
reasonable probability of success on the merits, (2) the party
will be irreparably injured by the denial of the relief, (3)
granting preliminary relief will result in even greater harm to
the nonmoving party, and (4) granting the preliminary relief will
be in the public interest.  Allegheny Energy v. DQE, Inc., 171
F.3d 153, 158 (3d Cir. 1999) (citation omitted).  "The Circuit
has placed particular weight on the probability of irreparable
harm and the likelihood of success on the merits." Apollo Tech.
Corp. v. Centrosphere Indus. Corp., 805 F.Supp. 1157, 1205
(D.N.J. 1992); see also Frank's GMC, 847 F.2d at 102.  The Court
cannot issue a preliminary injunction if either one or both of
those prerequisites is absent.  Id.  The Court is not required to
issue findings regarding the balance of the hardships and the

public interest when the party seeking a preliminary injunction does not establish both a reasonable likelihood of success and irreparable harm.  See, e.g., Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994).

## II.  Analysis

### A.   Likelihood of Success

To determine whether a moving party has demonstrated a reasonable likelihood of success on the merits, "[i]t is not necessary that the moving party's right to a final decision after trial be wholly without doubt; rather, the burden is on the party seeking relief to make a [p]rima facie case showing a reasonable probability that it will prevail on the merits."  Oburn v. Shapp, 521 F.2d 142, 148 (3d Cir. 1975) (citations omitted).

For the purposes of this opinion, the Court assumes <u>arguendo</u> that RC has a reasonable likelihood of success on the merits as to the claims asserted in the complaint.  The Court, however, will not issue a preliminary injunction because RC has failed to demonstrate that it will suffer irreparable harm.  <u>See</u> <u>Frank's</u> <u>GMC</u>, 847 F.2d at 102 n.2 (noting that because the court's determination as to irreparable injury was dispositive, it did not need to determine whether the plaintiff demonstrated a likelihood of success on the merits).  The Court cannot issue a preliminary injunction unless RC demonstrates both a likelihood of success on the merits and irreparable harm.

10

**B.    Irreparable Harm**

RC has not established the existence of irreparable injury supporting the entry of injunctive relief.  RC argues that an injunction is necessary to prevent irreparable harm to its trade secrets, good will, and reputation.  (RC Supp. Br., at 22-24; RC Reply Br., at 14.)

A party seeking a preliminary injunction must generally make "a clear showing of immediate irreparable injury." Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989); see also Apollo Tech. Corp., 805 F.Supp. at 1208 (noting that a plaintiff must show immediate irreparable injury, not a mere risk of irreparable harm).  "[T]o show irreparable harm, the plaintiff must demonstrate potential harm which cannot be redressed by a legal remedy." Instant Air Freight, Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 801 (3d Cir. 1989).  "The requisite feared injury or harm must be irreparable--not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (citations and quotations omitted); see also Apollo Tech. Corp., 805 F.Supp. at 1206 (noting that issuing a preliminary injunction is proper when it is the only way of protecting the plaintiff from harm).

Economic loss does not constitute irreparable harm. Acierno v. New Castle County, 40 F.3d 645, 653 (3d Cir. 1994).  "The

11

availability of adequate money damages belies a claim of irreparable injury." Frank's GMC, 848 F.2d at 102. "Loss of potential business opportunities, profits, customers, or contracts is compensable by money damages and does not constitute irreparable injury." Apollo Tech. Corp., 805 F.Supp. at 1209. "An inability to precisely measure financial harm does not make that harm irreparable or immeasurable." Frank's GMC, 848 F.2d at 655. "Mere injuries, however substantial, in terms of money . . . are not enough." Sampson v. Murray, 415 U.S. 61, 90 (1974); see also Instant Air Freight, 882 F.2d at 801 (citing Sampson).

### 1.   Harm to RC's Trade Secrets

#### i.   Applicable Law

RC asserts that a preliminary injunction must be issued in this action to prevent irreparable harm to its trade secrets and confidential information. Such an assertion, however, assumes that RC's idea of, and specifications for RC CTBs are a trade secret and confidential. For the purposes of this opinion, the Court will assume that RC's ideas and specifications are a trade secret.[6]  The Court here will discuss trade secret law only to

---

[6] The Court recognizes that the defendants argue that RC does not have a protectable trade secret.  (Defs. Br., at 24.) RC argues, however, that in order to be judicially protected "misappropriated information" need not rise to the level of a trade secret.  (RC Supp. Br., at 20; RC Reply Br., at 11.) Misappropriation of ideas is a separate area of law from trade secret law.  Johnson v. Benjamin Moore & Co., 788 A.2d 906, 922 (N.J. App. Div. 2002) (noting that the definition of a trade secret does not include a marketing concept or new product idea).

the extent necessary to analyze RC's claim of irreparable harm to its alleged trade secrets.  Such discussion is not conclusive as to the merits of RC's substantive claims.

In New Jersey, "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  Rohm & Haas Co. v. ADCO Chem. Co. , 689 F.2d 424, 431 (3d Cir. 1982) (noting that in federal court the law of trade secrets is governed by state law); see also Sun Dial Corp. v. Rideout, 16 N.J. 252, 257 (1954).  Matters of general knowledge in the industry, information in the public domain, and information that can be garnered by reverse engineering a finished product cannot be protected as trade secrets.  Id.; Smith v. BIC Corp., 869 F.2d 194, 199-200 (3d Cir. 1989).  New Jersey law provides a cause of action for misappropriation of a trade secret, however, "the right to protection begins and ends with the life of secrecy."

---

Confidential and proprietary information that does not rise to the level of a trade secret, however, is not entitled to the same level of protection from disclosure as a trade secret. Littlejohn v. Bic Corp., 851 F.2d 673, 685 (3d Cir. 1988); Hammock by Hammock v. Hoffman-LaRoche Inc., 662 A.2d 546, 560 (N.J. 1995).  By categorizing RC's information as a trade secret, the Court is affording RC's "idea" more protection.  The Court, therefore, will not analyze the degree of protection that RC's information should be given if categorized as confidential, but not a trade secret.

Darsyn Labs. Inc. v. Lenox Labs., Inc., 120 F.Supp. 42, 54 (D.N.J. 1954); see also Rohm & Haas Co., 689 F.2d at 429 (setting out elements of claim for trade secret misappropriation).  Once a trade secret is disclosed to the public, it is no longer protected.

For purposes of a preliminary injunction, a threat of disclosure of a trade secret may establish irreparable harm. Campbell Soup Co. v. Conagra Inc., 977 F.2d 86, 92 (3d Cir. 1992).  Further disclosure of a trade secret that has already been revealed, however, does not establish immediate irreparable harm.  Id. (plaintiff seeking a preliminary injunction to protect disclosure of its trade secret by the defendant, and the court noting "[w]e fail to see how immediate irreparable harm could arise at this time in light of the fact that [the defendant] has already revealed the . . . process").

### ii. Application

RC has alleged that without a preliminary injunction it will be irreparably harmed because it will not be able to control the development of its product.  (RC Supp. Br., at 21-22.)  Harm to RC's trade secrets or idea, however, does not constitute irreparable harm sufficient to issue a preliminary injunction because RC's secret and ideas have already been disclosed to the public.  There is no longer a secret or idea whose disclosure can

be enjoined or prevented.[7]  At oral argument, RC confirmed that buses embodying its idea are out in the public and on the road. (5-24-06 Tr., at 9.)  At the prior hearing on RC's application for a temporary restraining order, RC asserted that JMRL has "disclosed the trade secret information that is embodied in these buses."  (2-17-06 Tr., at 10.)

RC CTBs are operating in New York and Chicago.  (See www.romanchariot.net/pictures.shtml.)  These buses were manufactured by JMRL pursuant to its agreement with RC.  JMRL has also delivered at least six buses to Suburban Transit.  One was delivered prior to the commencement of this lawsuit on February 2.  (2-17-06 Tr., at 4, 9; 5-24-06 Tr., at 9.)  Several more buses were due to be delivered in February and March.  (Pavely Certif., Ex. H.)  In addition to the RC CTBs themselves being exposed to the public, RC's own website provides a detailed description of the RC CTB's (1) dimensions, (2) the features and materials that comprise the standard body, construction, and

---

[7] The Court acknowledges that at oral argument RC indicated that it was not "pressing the trade secret claim on the preliminary injunction application," but instead was challenging the continued misappropriation of its idea and property. (5-24-06 Tr., at 8-9.)  As noted, supra, by categorizing RC's "property" as a trade secret, the Court is affording RC more protection. (See supra note 6.)  Regardless of whether RC's "property" is considered an idea or a trade secret, it has been disclosed to the public.

passenger area, and (3) the elements that are included for the safety and comfort of the driver.[8]

The disclosure of RC's secret here is not merely a threat, it is a reality.  The disclosure of the secret to the public has already occurred through the production and use of buses embodying the secret, and the posting of the design details on the internet.  Any further or continued disclosure does not constitute an irreparable injury.  As the court in Campbell Soup recognized, the threat of disclosure of a trade secret may constitute irreparable injury, but the further disclosure of something already revealed cannot.  JMRL's action may have inappropriately revealed a trade secret of RC, and RC may prevail on its claims of misappropriation and breach of the confidentiality and exclusivity agreement.  Any injury from JMRL's sale of RC CTBs, however, is not irreparable because it can be redressed through money damages.  RC's secret has been disclosed.  The Court, therefore, will not enjoin the disclosure and delivery of something that would be a nullity to enjoin.

### 2.   Harm to Good Will and Reputation

#### i.   Applicable Law

RC asserts that without a preliminary injunction its good will and reputation will be irreparably harmed.  Irreparable

---

[8] See www.romanchariot.net.  The website also provides diagrams of the floorplan of the buses, and photographs of the buses operating in Chicago and New York.

injury for the purposes of a preliminary injunction may include
"loss of control of reputation, loss of trade, and loss of good
will."  <u>Opticians Assoc. of Amer. v. Indep. Opticians of Amer.</u>,
920 F.2d 187, 195 (3d Cir. 1990); <u>see also</u> <u>Jiffy Lube Int'l, Inc.</u>
<u>v. Weiss Bros., Inc.</u>, 834 F.Supp. 683, 692 (D.N.J. 1993).  The
plaintiffs in <u>Opticians</u> and <u>Jiffy Lube</u>, however, sought
preliminary injunctions to prevent harm to their reputation or
good will resulting from the defendants' use of their trademarks,
not the defendants' use or misappropriation of their trade
secrets or other confidential information.  <u>Id.</u>

Trademark infringement cases, unlike trade secret cases, are
concerned with the confusion that results from the misuse of
another's mark.  <u>Acierno</u>, 40 F.3d at 654 (distinguishing
<u>Opticians</u> and finding that no significant damage to plaintiff's
reputation had been shown to demonstrate irreparable harm); <u>see</u>
<u>also</u> <u>Opticians</u>, 920 F.2d at 196 ("[p]otential damage to
reputation constitutes irreparable injury for the purpose of
granting a preliminary injunction in a <u>trademark case</u>" (emphasis
added)); <u>Pedi-Care, Inc. v. Pedi-A-Care Nursing, Inc.</u>, 656
F.Supp. 449, 457 (D.N.J. 1987) (enjoining defendant's use of
plaintiff's service mark noting that "the potential exists that
defendant's use of a name confusingly similar to the plaintiff's
service mark will result in damage to plaintiff's reputation");
<u>cf.</u> <u>BP Chem. Ltd. v. Formosa Chem. Corp.</u>, 229 F.3d 254, 263 (3d

17

Cir. 2000) (affirming district court's order granting a
preliminary injunction when <u>threatened</u> disclosure of a trade
secret would affect a company's reputation (emphasis added)).

### ii.  Application

The claims asserted by RC in the complaint do not implicate
or concern trademark infringement.  RC neither has a trademark in
its name, nor prominently displays its name on the buses that are
manufactured for it.  Rather, the name of the tour company that
purchases the buses appears on the exterior of the bus.  RC
attempted to register a trademark over a year and half after it
went into business, but the mark could not be registered because
it was already in use by another business.  (Defs. Br., at 3; 5-
24-06 Tr. at 23.)

Even without a trademark, RC alleges that other bus
purchasers will be confused because JMRL referred to the bus as
the "Roman Chariot" in its "secret sale" to Suburban Transit.
(RC Reply Br., at 14.)  Without more, however, JMRL's reference
to the Roman Chariot does not provide sufficient evidence to
demonstrate that bus manufacturers associate the term "Roman
Chariot," or the design of the RC CTB with the company RC.  RC
functions as a broker for those companies seeking to purchase
tour buses.  As stated <u>supra</u>, no RC name or logo appears on the
bus.  Whether a bus purchaser goes through RC or not, another
company has to manufacture the bus.  In this action, therefore,

18

there is no concern that either the public or bus purchasers will be confused by JMRL's manufacture of the RC CTB without the authorization of RC.  Those cases that have determined that harm to the plaintiff's good will or reputation in the context of a trademark or service mark was irreparable, therefore, are distinguishable.  See e.g., Acierno 40 F.3d at 653-54 (distinguishing Opticians).

If injury to reputation and good will outside of the trademark context were irreparable, RC does not demonstrate sufficient harm to its reputation or good will to warrant a preliminary injunction.  "Any definition of goodwill includes the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage."  Marsh & McLennan, Inc. Comm'r of Internal Revenue, 420 F.3d 667, 669-70 (3d Cir. 1969); see also Black's Law Dictionary 694 (6th ed. 1990) ("the favor which the management of a business wins from the public. . .the benefit or advantage of having established a business and secured its patronage by the public).  RC has not provided the Court with sufficient evidence to conclude that RC has good will or a reputation capable of injury.

RC was formed in 2004 for the purpose of commercializing the idea for a particular type of tour bus.  The first bus embodying the idea was not created until December 2004 and a commercial

19

sale was not made until February 2005.  RC has had two customers,
Private One in New York, and Gray Line in Chicago, over the
course of its less than two year existence.  A total of seventeen
buses were sold between February 2005 and October 2005.  (RC
Supp. Br., at 12.)  RC's efforts, if any, to market its RC CTB
have been minimal.  (Id. at 8.)  It has not sold any buses in
2006.  (Id. at 14.)  RC has not presented evidence that its two
customers will continue their patronage.  It has not provided
sufficient evidence that it enjoys a particular reputation, name
recognition, or good will among bus purchasers, manufacturers, or
riders.

RC argues that without an injunction its reputation will be
affected because it will not be able to control the quality of
the buses that are produced.  It asserts that if JMRL produces an
inferior product, RC's reputation will suffer.  (RC Supp. Br., at
23.)  As noted, supra, RC has not demonstrated that it enjoys a
particular reputation capable of injury.  Additionally, what
constitutes an inferior product, and the potential injury that
would result are speculative and cannot form the basis of
irreparable harm to RC.

RC asserts that it has had no sales in 2006 and that JMRL's
continued production of tour buses embodying RC's idea forces RC
to (1) compete with JMRL, and (2) find another manufacturer for
RC CTBs.  These injuries, however, amount to economic losses and

are not so peculiar that a monetary remedy would not suffice.  As recognized in <u>Apollo</u>, the loss of potential customers or profits is compensable by money damages.  Such damages are not irreparable even though a precise measure of financial harm cannot be made.  <u>See</u> <u>Frank's GMC</u>, 848 F.2d at 102; <u>Apollo</u>, 805 F.Supp. at 1209.  Accordingly, RC has failed to demonstrate that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief.  The Court, therefore, will not issue a preliminary injunction.

The Court need not address the harm to JMRL or the public interest because RC has failed to demonstrate irreparable harm will result in the absence of a preliminary injunction.  <u>See</u> <u>Clark</u>, 979 F.2d at 969.

### CONCLUSION

RC has failed to establish its entitlement to a preliminary injunction against the defendants.  It has not shown that it will suffer immediate, irreparable harm without the issuance of preliminary injunctive relief.  The Court, therefore, will deny RC's motion for a preliminary injunction in an appropriate order.


      s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge